UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ESTATE OF EARLVIN TODD NEAL,
by and through its personal representative,
Angela Mica Neal,

                     Plaintiff,

v.                                   CASE NO. 8:03-CV-247-T-17MAP

PINELLAS COUNTY SHERIFF'S OFFICE, *et al.*,

                     Defendants.
_____/

## REPORT AND RECOMMENDATION

On a dark summer evening, Earlvin Todd Neal turned a white Ford pickup truck into the circular driveway of an Oldsmar, Florida residence and parked. He kept the engine running while his passenger stepped inside the house. Suddenly, Pinellas County deputies Miller and Borland, who suspected Neal to be delivering drugs, emerged from behind a wooden fence. With their guns and flashlights pointed at Neal, Miller commanded him to raise his arms. Neal complied. But then, for some unknown reason, he lowered his hands and leaned to his right. As Miller confronted Neal at the driver's window, Borland crossed the front of the truck toward Miller. Borland could see Neal refusing Miller's commands. Then Neal revved the engine. The truck lunged toward Borland. Borland fired five shots and killed Neal.

Now Neal's wife as personal representative of his estate has filed this action against Borland and the Pinellas County Sheriff's Office under 42 U.S.C. § 1983 claiming Borland violated her husband's Fourth Amendment rights by using excessive force and the Pinellas County

1

Sheriff's Office implemented policies that encouraged such unconstitutional actions.  She also brings a state negligence claim against the Sheriff's Office.  Borland, however, says he acted in self-defense, and both Defendants move for summary judgment on qualified immunity grounds asserting no constitutional violation occurred (*see* docs. 19 and 70 with Plaintiff's responses at docs. 80 and 97).  Having reviewed the expansive summary judgment record and listened to the parties' oral arguments, I agree with Defendants and recommend the district judge grant the Defendants' motions for summary judgment as to Plaintiff's federal claims.[1]

*A.  Standard of Review*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*  477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*

*B.  Facts*

On July 14, 2002, Frederick Freeman, angry with his ex-girlfriend and likely influenced by the beers he had consumed, called 911 to report he wanted her arrested and "off the streets." He adamantly insisted a felony warrant existed for her arrest.  The 911 operator, possibly

---

[1]  United States District Judge Elizabeth A. Kovachevich referred these motions to me for report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 6.01(b).  *See* doc. 112.

perplexed by the call or uncertain about the caller, dispatched a Pinellas County Sheriff's deputy to Freeman's location, 604 Park Boulevard in Oldsmar. Hopefully, the deputy could sort matters out (doc. 81, ex. 7 and 8).[2]

When the deputy arrived, Freeman repeated his claims about his girlfriend. Yet, despite Freeman's insistence and the deputy's diligent search of the available databases, the deputy could not find any warrant for her arrest. That did not quell Freeman's quest. Undeterred, Freeman reported she was a "crack head" who could, along with the two men that lived with her, deliver cocaine on demand. This last claim apparently interested the deputy, who relayed the information to the sergeant of his unit. *See* doc. 81, ex. 8. From this, representatives of the Pinellas County Sheriff's Office Omega Unit developed a plan: Freeman would call his girlfriend and ask her to deliver to him $100 worth of cocaine base; if she agreed, two deputies would monitor the purchase inside Freeman's Park Boulevard house protected by two deputies positioned outside for tactical cover. *Id.*

At approximately 8:40 p.m. Freeman called his girlfriend's telephone number using a department cell phone. One of her roommates, Charles Rumph answered. When Rumph explained to Freeman she was not there, Freeman asked Rumph for cocaine. Rumph handed the phone to the other roommate, Rob Maher, who quickly agreed to the deal. Ten minutes later Maher showed up and sold Freeman a small quantity of crack. Deputies immediately arrested Maher, who then promptly confessed, fingered Rumph, and agreed to call Rumph for more drugs.

---

[2] It was obvious that Freeman had been drinking heavily sometime before the first deputy responded to the 911 dispatch. One deputy who arrived later said Freeman smelled of alcohol, had bloodshot, watery eyes, and slurred his speech. Empty beer cans littered the kitchen and the coffee table (Miller deposition at doc. 81, ex. 20, pp. 73-76).

*Id.*

As Maher worked the department's cell phone to reach Rumph, Freeman grew impatient with Maher's lack of progress.  Perhaps bent on proving to the police he could do better than Rumph or over-enthused about assisting law enforcement, he decided to take matters into his own hands.  Unbeknownst to the deputies, Freeman picked up Maher's cell phone and called another supplier, someone Freeman had dealt with before.  In mid conversation, one of the officers overheard Freeman say, "I need to talk to Todd," and then "I need you to bring some 'C' right away."   Todd apparently agreed because Freeman replied, "Okay Todd, I'll see you in a little while."  *See Id.*  Freeman's unsupervised effort, as the deputies quickly realized, presented a potential dilemma for them – two different suppliers arriving at the same place at the same time to sell drugs to two different buyers.

Corporal Miller and Deputy Borland, both experienced officers, positioned themselves behind a six foot wooden privacy fence and waited.  Tasked with securing the outside, they had been warned to expect two possible drug deliveries, one by a black male (Rumph) in a red pickup truck and another by someone named "Todd."  Neither deputy knew what Todd looked like nor what he would be driving.  Irrespective, Miller as the ranking deputy reviewed the tactical approach plan with Borland.  They would "cover and contact" using an "L" maneuver so that neither would be caught in a crossfire if something violent occurred.  Miller, who would take the lead with Borland as the backup, reiterated that he wanted to see the suspect's "hands" and "compliance" before they approached.  *See* Miller deposition at doc. 81, ex. 20, pp. 119-122.

At about 10:30 p.m., a white Ford Ranger pickup truck towing a landscaping trailer with a riding lawnmower aboard pulled into Freeman's dark circular driveway and parked.  Earlvin

Todd Neal kept the engine running as his passenger, Charles Pratt, stepped inside Freeman's place.  Seeing this, Miller signaled Borland, and the two deputies made a "high risk vehicle approach" pointing their weapons and flashlights at Neal.  Miller shouted "Police.  Let me see your hands."  Neal complied.  Miller, fearing he could be pinned by the trailer if he approached Neal from behind, looped around the truck's front to the driver's side all the while continually eyeing Neal's raised hands and purposely yelling commands to "overload" Neal's senses.  As Miller worked toward Neal, Borland momentarily trailed behind Miller's left in a fast controlled walk pointing his weapon and flashlight at Neal.  Then the red pickup pulled into the driveway. *Id* at pp. 130-155; Borland's deposition at doc. 81, ex. 17, pp. 24-25.[3]

Miller, now next to Neal, ordered: "Police.  Keep your hands where I can see them.  Exit the vehicle.  Do it now."  Although compliant before, Neal's behavior changed.  He lowered his hands slightly, leaned over to his right, and shook his head "No."  Miller again ordered Neal to show his hands and get out of the truck.  "Naw, [expletive] that," said Neal, who then put the truck in gear and released the clutch only to stall the engine.  Miller slapped Neal's forearm with stinging disapproval: "Don't drive off.  Stop the vehicle.  Keep your hands where I can see them." Miller deposition at doc. 81, ex. 20 at pp. 154-162; Miller deposition at doc. 81, ex. 21, pp. 5-7.


As Borland crossed the truck's front, he could see Neal refusing Miller's commands. Despite Miller's slap and stern directives, Neal restarted the engine.  Borland, now only a couple of feet away from the driver's front wheel (at about the driver's 11 o'clock position) and no longer able to see Neal's hands, heard Miller yell, "Don't do it."  Neal revved the engine hard and popped

---

[3]  Rumph was a passenger in the red truck (doc. 81, ex. 28).

the clutch.  The truck lunged forward toward Borland.  Fearing it would hit him, he fired five shots as he moved to avoid the truck.  Two of the bullets struck Neal's chest.  *See* Borland affidavit at doc. 81, ex. 17, attachment 1 at ¶s 11-16; Borland deposition at doc. 81, ex. 17. at pp. 33-34; Miller deposition at doc. 81, ex. 20 at pp. 162-166; doc. 81, ex. 14.  The pickup circled the driveway and coasted to a stop.  Neal expired shortly before midnight.  Neither Neal nor his passenger that night possessed any drugs.  *See* Borland deposition at doc. 81, ex. 17, pp. 37-38, 59.[4]

B. *Discussion*

1. *Qualified Immunity*

The Supreme Court has repeatedly stressed qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis in original)).  The doctrine offers complete protection for government officials who are sued in their individual capacities where "their conduct violates no clearly established statutory or constitutional rights that a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Its purpose is to shield from suit "all but the plainly incompetent or one who is knowingly violating the federal

---

[4]  Plaintiff contends Borland paused long enough before firing the fatal last three shots that he could have taken stock of his predicament and concluded Neal no longer presented a threat to him.  Obviously, such an argument infers that Borland justifiably feared for his safety when he fired the non-fatal rounds.  Regardless, the overwhelming evidence in the record is that any pause was extremely fleeting.  Borland fired all five shots in rapid succession.  *See* doc. 81, Borland deposition at ex.17, p. 27; Borland sworn statement at ex. 18, p. 7; Rumph sworn statement at ex. 28, p. 4.  In other words, I find there is no genuine issue of material fact as to this matter.  *See Anderson v. Liberty Lobby, Inc.,* at 477 U.S. 248.

law" thereby allowing government officials to carry out their discretionary duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Thus, once an official demonstrates he was engaged in a discretionary function, the burden falls to the plaintiff to show the official is not entitled to qualified immunity protection. *Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir. 2004).

Plaintiff concedes that making an arrest or detaining a suspect clearly falls within the official responsibilities of a sheriff's deputy and, therefore, within the ambit of discretionary functions. *See* doc. 80 at p. 14. Consequently, to show Borland is not entitled to immunity, Plaintiff must satisfy *Saucier's* two-step test: the officer's conduct violated a constitutional right and the right was clearly established. Answering the first part requires looking at the facts "in the light most favorable to the party asserting the injury." *Id.* at 201. If from this vantage the court can find no constitutional violation, the inquiry ends; the court need not address *Saucier's* second step. *Id.*

Plaintiff, to support her claim that Borland violated her husband's Fourth Amendment guarantees against an unreasonable seizure, offers three theories. First, Plaintiff focuses on what she claims Borland should have done and could have done in those milliseconds between the second shot and the deadly third and fourth shots. In that fleeting moment, Plaintiff surmises Borland had time to think, assess the risks he faced, conclude that he had safely evaded the truck, determine that Neal no longer presented a danger to him or Miller, and restrain himself from firing again (doc. 80).[5] In her opposition papers to the summary judgment motion, Plaintiff posits

---

[5] As a corollary to this argument, the Plaintiff claims these facts are in sufficient dispute so as to require a trial.

another theory: if Borland had followed "generally accepted police practices," he would not have killed her husband because he would have been somewhere other than in front of the truck (doc. 80).  Finally, at the oral argument, Plaintiff added another: Borland and Miller lacked reasonable suspicion or probable cause to make a stop or an arrest.  All three arguments miss their predicates either factually, legally, or both.

The Fourth Amendment protects against unreasonable searches and seizures and these protections extend to brief investigatory stops of persons or vehicles that fall short of the traditional arrest.  *United States v. Arvizu,* 534 U.S. 266, 273 (2002).  To satisfy the constitutional demands for such an encounter, however, the officer must have reasonable suspicion to believe criminal activity "may be afoot."  *Id.*; *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  Courts reviewing the constitutionality of such a stop look to the "totality of circumstances" to see if the detaining officer had a "particularized or objective basis" for suspecting legal wrongdoing.  *Arvizu,* 534 U.S. at 273; *United States v. Cortez*, 449 U.S. 411, 417 (1981).  In other words, consideration must be given to whether the officer had facts to warrant the action taken.  *Terry,* 392 U.S. at 21-22.  The officer can draw on his experience and training to make inferences and deductions about the cumulative information available to him.  *Arvizu,* 534 U.S. at 273.  If the officer is mistaken, yet reasonably believes that reasonable suspicion is present, he is still entitled to qualified immunity.  *Jackson v. Sauls,* 206 F.3d 1156, 1165-66 (11th Cir. 2000).  And the measuring stick here is "arguable" reasonable suspicion to support an investigatory stop.  *Id.*  That standard is a less demanding one than probable cause and requires a showing considerably less than a preponderance of the evidence.  *Illinois v. Wardlow,* 528 U.S. 119, 123-24 (2000).  It is enough that the officer can articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.  *Id.* (quoting *Terry v.*

*Ohio,* 392 U.S. at 27).  Borland and Miller had more than arguable suspicion to believe that Neal's arrival  spelled "criminal activity was afoot."   Both officers anticipated someone besides the occupant of a red truck would be delivering drugs that night, and Neal arrived shortly after the deputies received the alert.   Besides, nothing Neal did that night diminished the officers' reasonable suspicions.  Indeed, the Plaintiff does not seriously contest the quantum of "reasonable suspicion."[6]

Plaintiff's excessive force argument likewise fails given the facts and the applicable law.  In two recently decided excessive-force cases where officers faced circumstances strikingly similar to Borland and Miller's, the Eleventh Circuit restated the constitutional contours for using deadly force when seizing a suspect.  Deadly force is "reasonable" when an officer:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that use of deadly force was necessary to prevent escape; and (3) has given some waning about the possible use of deadly force, if feasible.

*See Troupe v. Sarasota County,* __ F.3d __, 2005 WL 1819363 (11th Cir. 2005) (quoting *Robinson v. Arrugueta,* 415 F.3d 1252, (11th Cir. 2005)).  Courts measure the reasonableness of the force applied using the Fourth Amendment's traditional objective standard: the perspective of a reasonable officer on the scene with the attendant facts and circumstances.  *Saucier,* 533 U.S. at 204-205; *Grahman v. Connor,* 490 U.S. 386, 388 (1989); *Robinson v. Arrugueta,* 415 F.3d 1252, 1255 (11th Cir. 2005).  In other words, reasonableness is not to be judged from the solitude of chambers and the benefit of time and 20/20 hindsight.  *Crosby,* 394 F.3d at 1333-1334.  Instead,

---

[6]  The fact that the officer draws his weapon does not convert the stop into an arrest. *Jackson v. Sauls,* 206 F.3d at 1167 n.13.

"[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97.   And these instant judgments are intensely personal for the officer because doing nothing might prove fatal.  *Crosby,* 394 F.3d at 1333-1334.  This is particularly so when an officer on foot confronts a suspect in a motor vehicle who refuses to obey orders.   Both *Troupe* and *Robinson* vividly illustrate qualified immunity's application to these tense and dangerous encounters.[7]

In *Troupe*, a SWAT team rushed to arrest a suspect (Hart) as he exited a house.  Hart, who had a violent past, and two other men including Robinson (Troupe acted as Robinson's personal representative) quickly locked themselves in an Oldsmobile parked in the driveway.   Despite police commands to get out, Hart revved the engine loudly and jerked the car back and forth. Suddenly, Hart made a hard left to flee.  One deputy unsuccessfully fired a shot to blow out a tire. Another one, fearing that the car would hit him fired two shots at the driver.  The car sped off eventually crashing into a wall killing Robinson.  Although the court decided the crash and not the deputies were the proximate cause for Robinson's injuries, it nonetheless concluded the defendants were entitled to qualified immunity.  The officers used reasonable force because Hart

---

[7]   The Supreme Court recognizes that officers who encounter citizens in moving vehicles face particular dangers.  *See Michigan v. Long,* 463 U.S. 1032, 1049 (1983) (extending *Terry's* rationale to searches of automobile interiors during traffic stops because such an encounter is "especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding the suspect").  Similarly, the law existing in Florida at the time of this incident instructed that an automobile, when used to commit an assault, a battery, or with intent to kill, may be considered a deadly weapon.  *Williamson v. State of Florida*, 111 So. 124 (1926); *Beard v. State of Florida*, 842 So. 2d 174 (Fla. Dist. Ct. App. 2003).

posed a danger to the SWAT team and the public.

The *Robinson* panel likewise deferred to an officer's split-second decision-making in a citizen-automobile encounter.  Agents gathered by a doughnut shop waiting for a delivery of heroin to take place as predicted by a cooperating suspect who agents had just arrested.  When the suspect car arrived, all but one of its occupants entered the shop.  An agent confronted the remaining person in the car.  Positioned between the suspect's vehicle and a parked car, the agent ordered the suspect to show his hands.  The suspect refused, grinned, and then slowly moved the car forward.  With only a couple of feet to maneuver and fearful he would be pinned between the two automobiles, the agent shot the suspect through the windshield while getting out of the car's path.  The Eleventh Circuit found the agent had probable cause to believe that the suspect posed a threat of serious physical harm; thus, no constitutional violation occurred.

Borland faced the same fears and instant decisions – he reasonably feared Neal would run him over if he did not act.  His closeness to the truck, just a couple of feet away, compounded by Neal's refusal to obey Miller's commands, revving the engine hard, and then popping the clutch, made that risk very real.  Yet, Plaintiff argues Borland should have acted differently: he should have approached Neal from behind; or he never should have positioned himself in front of the truck; or he could have gotten out of the way safely without injury to himself; or he should have stopped firing his weapon after the first two shots thereby sparing the deadly strikes.  These would-have, could-have, should-have arguments ignore the narrow perspective this Court must apply when contemplating Borland's conduct that dark night.  As the *Robinson* court admonished: "[o]ur precedent instructs us to take into account that reconsideration after the uncertainty and the excitement of the moment have passed will nearly always reveal that something different could

have been done if the future was known before it occurred." *Robinson,* 415 F.3d at 1256 (citation omitted). Perhaps Borland and Miller would have escaped unharmed if Borland had not fired his weapon (but maybe not). Or perhaps Borland and Miller could have safely approached Neal from the rear. Despite the tenseness of the night, possibly some other officer would have cooly sidestepped the lunging truck or would have possessed the presence to limit his rapid-fire discharge to two shots. But such second-guessing misses the right question. And that is: would a reasonable officer in Borland's position have had probable cause to believe that Neal posed a threat of serious physical harm to that officer? After applying the standard of review that I must, the answer to that question is yes. A reasonable officer would have concluded he was in the truck's path; that he could not evade the truck without taking deadly action against the driver; and that it was impossible to stop and assess the risk Neal presented in between firing the second and deadly third and fourth shots. Accordingly, Borland is entitled to qualified immunity under the first step of the *Saucier* analysis.

Though there is no need to advance to the second prong of the *Saucier* test, assuming, for purposes of this motion that Defendants violated Neal's constitutional rights, the next question is whether the right was clearly established. Borland can be afforded qualified immunity provided Neal's rights were not clearly established at the time of the incident. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier, supra.* A plaintiff can demonstrate that his rights were clearly established by showing that a materially similar case has already been decided, giving notice to the police. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Or a plaintiff can show that a broader, clearly established principle should control

the novel facts in this situation. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

On July 14, 2002, the preexisting law would not have alerted Borland that his use of force in this particular situation was unlawful. To the contrary, no controlling law established that given the circumstances Borland's actions were not so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer facing the circumstances would have known that the acts violated preexisting law. *See Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1280-81 (11th Cir. 2004).

### 2. *Pinellas County Sheriff's Office and Sheriff Rice*

Plaintiff asserts in Count II that the Pinellas County Sheriff's Office and Sheriff Everett S. Rice ("Rice") committed numerous acts subjecting them to liability for Borland's conduct.

### a. *Sheriff Rice, in his individual capacity*

All of the Plaintiff's allegations concern Rice's actions clearly within the discretionary functions of his job as Sheriff. Specifically, Plaintiff alleges Rice, as Sheriff, enacted policies that encouraged hiring and retaining deputies, like Borland, who were not adequately trained or supervised, failed to adequately train or educate the deputies as to proper use of force when making arrests, and failed to institute sufficient and adequate policies explaining the proper and legal manner to determine criminal violations of Florida law and to detain, arrest or use deadly force against those who violate such laws so as not to violate well-established constitutional rights. The Plaintiff further asserts the Sheriff's office and Rice failed to monitor and supervise its deputies with respect to tactics being employed when working in the field, constituting a deliberate indifference to Plaintiff's constitutional rights and failed to train or supervise Borland, resulting in Neal's death and Plaintiff's damages. A supervisor sued in his individual capacity is

13

entitled to qualified immunity unless the Plaintiff can establish that a reasonable supervisor would have known that his or her actions were unlawful in light of the clearly established law and the information the supervisor possessed. *Dolihite v. Maughon*, 74 F.3d 1027 (11th Cir. 1996).

Here, Plaintiff has not shown that a reasonable supervisor would have known that his or her actions were unlawful in light of the clearly established law and the information Rice possessed, and thus, has not met its burden. In addition, Plaintiff has failed to present a causal connection between Rice's supervisory acts and the allegedly unconstitutional acts of Officer Borland. *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003)). Accordingly, Sheriff Rice is entitled to qualified immunity and summary judgment with regard to the claims brought against him in his personal capacity.

### b. Sheriff's office

The Plaintiff asserts the Sheriff's office's custom or policy of failing to take remedial measures to prevent its deputies from committing constitutional violations amounted to a deliberate indifference or tacit authorization of offensive acts. However, an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation occurs. Since I already determined that Borland did not infringe any of Neal's constitutional rights and Count II does not allege further constitutional violations, even if the Sheriff's department was negligent in supervising Borland, its negligence did not amount to a constitutional violation by Borland against Neal. Hence, Plaintiff cannot establish damages and summary judgment in favor of Defendants on Plaintiff's claims raised in Count II is appropriate. *See generally City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at

the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1242 n.13 (11th Cir. 2003) (where officer's arrest and use of force were constitutionally permissible, there could be no policy or custom of the city that officially sanctioned or ordered a constitutional violation); *Cuesta v. School Board of Miami-Dade County, Florida*, 285 F.3d 962, 970 n.8 (11th Cir. 2002) (stating that because Cuesta suffered no deprivation of constitutional rights, court need not decide question of whether county policy might deprive others of constitutional rights); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir.1996) (finding that when the deputy's conduct did not cause plaintiff to suffer a constitutional deprivation, there is no need to inquire into the sheriff's department's policy or custom).

### 3. Negligence claims against Sheriff's Office

In Count III, Plaintiff alleges that as a proximate result of the Sheriff's Office's negligence, Neal incurred numerous losses and damages including the deprivation of his civil rights, loss of physical liberty, mental anguish, serious and permanent bodily injury, loss of capacity to enjoy life, inability to lead a normal life, medical expenses, public humiliation, damage to his reputation, and death.  Plaintiff further asserts that she has incurred expenses, wage loss, pain and suffering, loss and support and services, loss of consortium, and loss of parental guidance.  Obviously, this claim is a pendent state law claim for negligence.  Complaint, doc. 1, ¶ 44.  Though federal courts have the power to hear state law claims which "derive from a common nucleus of operative fact" with a substantial federal claim, the power should not be exercised as a matter of course, especially where the federal claims are dismissed before trial.  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).  I find that judicial economy, fairness, convenience, and

comity dictate that the state court should decide the state claim.  Accordingly, I recommend Count III be dismissed without prejudice and remanded to the state court.

*C.  Conclusion*

For the reasons stated, I find Borland's conduct did not violate Neal's constitutional rights, and thus, the Defendants are entitled to qualified immunity.  Accordingly, it is

RECOMMENDED:

1.      Defendants' motions for summary judgment (docs. 19 and 70) be granted as to Counts I and II.

2.       Count III be dismissed without prejudice and remanded to state court.

IT IS SO REPORTED at Tampa, Florida, on September 1st, 2005.


MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


16

## <u>NOTICE TO PARTIES</u>

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon ground of plain error or manifest injustice.  28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainright*, 677 F.2d 404 (5th Cir. 1982)(en banc).

Copies furnished to:
Hon.Elizabeth A. Kovachevich
Counsel of Record